UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-22204

CIV - GOLD

MAGISTRATE JUDGE TURNOFF

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

CHARLES O. MORGAN, JR., as Personal Representative of THE ESTATE OF FREDERICK J. KUNEN,

Defendant.



FILED by _____ D.C.
INTAKE
AUG 23 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

### INTRODUCTION

1. The Commission brings this action to freeze assets and prevent Defendant Charles O. Morgan, Jr., as Personal Representative of The Estate of Frederick J. Kunen, from dissipating investors' assets associated with a fraudulent investment scheme operated by Frederick J. Kunen until his death on July 11, 2007. Starting no later than January 2007, Kunen pitched a sham index options trading program to primarily inexperienced investors with false promises that their principal would be safe. To entice investors, Kunen falsely represented his options trading program had an eight-year track record and guaranteed a 10% to 20%, risk-free, monthly return. In reality, investors lost all or nearly all of their invested principal, and Kunen profited by approximately $1 million of the $2.5 million he raised.

2. In addition to the material misrepresentations and omissions described above, Kunen defrauded investors into transferring funds to him as compensation by misrepresenting he had made profitable trades on their behalf. Finally, Kunen failed to disclose to investors he was

convicted of securities fraud, and subsequently incarcerated for violating his probation by committing bank fraud.

3. Kunen misappropriated approximately $1 million of his investors' money for his own coffers. Approximately $751,702 of investor funds remain in an E*Trade account under Kunen's name. Morgan recently contacted E*Trade and inquired about this money for the benefit of the Kunen Estate. Accordingly, in order to prevent the further dissipation of investor assets, the Commission seeks emergency relief in the form of an asset freeze, an order prohibiting the destruction of records, the appointment of a receiver, and an accounting from Morgan, as the Personal Representative of the Kunen Estate.

## DEFENDANT

4. Defendant Charles O. Morgan, Jr., 67, is the Personal Representative of the Kunen Estate. He is licensed to practice law in Florida, and maintains his own law office in the Southern District of Florida. The Kunen Estate came into existence upon Kunen's death on July 11, 2007. Kunen was 55 years old. He resided in Coconut Creek, Florida. On October 29, 2001, Kunen pled guilty to one count of securities fraud in connection with his participation in a Ponzi scheme. U.S. v. Frederick Kunen, Case No. 01-689-CR-MORENO. After serving a prison sentence in connection with his guilty plea, Kunen violated his probation in early 2004, and in August 2004 was sentenced to two years' imprisonment and re-incarcerated based on bank fraud charges.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d) and 78aa.

2

6. This Court has personal jurisdiction over the Defendant and venue is proper in the Southern District of Florida because many of Kunen's acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida. In addition, Kunen previously resided in the Southern District of Florida and the Kunen Estate was established in the Southern District of Florida.

7. Kunen, directly and indirectly, has made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## THE FRAUDULENT SCHEME

### I. Kunen's Options Trading Program

8. From at least January 2007 through July 2007, Kunen raised approximately $2.5 million from at least nineteen investors residing throughout the United States. Kunen preyed on unsophisticated investors, convincing them to participate in an options trading program he guaranteed would make 10% to 20% in monthly returns.

9. Kunen offered the options trading program to prospective investors over the telephone, via e-mail, and by word-of-mouth through finders, whom Kunen compensated for investor referrals. Targeting mainly individuals with little or no investment experience, Kunen enticed them to invest in the options trading program by claiming their investments had no risk, and they only had to compensate him a percentage of profits he obtained from each option trade.

10. Kunen gave investors varying accounts of the success of his trading strategy and his background, including telling some investors he had an eight-year, successful track record, and he previously owned a brokerage firm. He never disclosed that, in reality, his index options trading strategy was risky, or that he was a convicted felon for securities and bank fraud.

3

11.     Kunen made the same guarantees of 10% to 20% monthly returns and risk-free principal in written materials he provided to potential investors. The written materials stated that Kunen personally guaranteed the principal amounts invested "regardless of any unfavorable market conditions." Kunen further represented in writing that a $50,000 "minimum investment" in the options trading program would swell to approximately $35 million before taxes in three years.

12.     Once an individual decided to invest, Kunen required him or her to provide total access to their brokerage account in the investor's name with an online firm (initially E*Trade Securities LLC, and later TD Ameritrade). Kunen told some investors to open an account with margin, obtain login and password information, provide that information to Kunen, and then fund the account. Kunen or one of his intermediaries told others to give Kunen their personal information, including social security number. Kunen then used that information to establish a brokerage account on the investor's behalf. Kunen then relayed to the investor the account information and directed the investor to fund the account.

13.     After the investor funded the brokerage account, Kunen used the investor's login information to access the accounts and trade the available funds in index options. Kunen typically made two transactions of S&P 500 Index options in each investor's account to create a temporary illusory credit. The first part of Kunen's scheme involved the purchase of call option contracts that entitled Kunen, on behalf of the investor, to acquire shares of the S&P 500 Index at a certain price. This stated price, or "strike price," gave Kunen, on behalf of the investor for whom he was trading, the right to buy the shares at a certain price when he exercised the options contract. The option contracts expired on a certain date after the day of purchase.

14.     The second part of Kunen's trading scheme involved the sale of a different option contract that would have to be covered in the future on or before the contract expired at a certain

strike price. Until Kunen purchased matching option contracts to cover the sale, it was impossible to determine whether the transaction was profitable or unprofitable. In other words, the actual loss or profit from Kunen's trading of the respective investor's options contract could not be determined until after Kunen executed the second part of his trading strategy.

15. In order to account for Kunen's options trading, E*Trade would create an immediate, temporary illusory credit in the investor's brokerage account. To execute his scheme to defraud, Kunen took advantage of this temporary illusory credit and contacted the investor whose account had the credit, either directly or through an intermediary, and informed them he had completed his trading strategy and it had resulted in a profit. Kunen knew, however, that the temporary illusory credits were unrealized and that no real profits occurred from his trading.

16. Investors had no input in the investment decisions and no role in the management or operation of Kunen's trading strategy.

17. The investors relied on Kunen's misrepresentations concerning his options trading program and his lies about the supposed profits. As part of his scheme, Kunen told investors they were entitled to keep up to a 20% investment return. Kunen required them to wire any additional profits to him or another party on his behalf as compensation for his trading. Based on Kunen's fraudulent misrepresentations, investors wired their funds either directly into his E*Trade account, or from their personal bank accounts to a bank account he specified.

18. To perpetuate his scheme, Kunen touted E*Trade account statements showing the unrealized credits. Because of the investors' inexperience and the relative complexity of Kunen's securities transactions, the investors could not decipher their account statements to understand that the credit in their accounts was only temporary and contingent on future events.

19. At certain times after trades had been made but before the options had expired, it may have appeared to investors their account balances were positive (reflecting unrealized profits).

Because the trades created a temporary, positive spread—subject to change based on the expiration of the options—Kunen led investors to believe the spread was actually a fully realized profit. However, a review of the account balances after the expiration of the options Kunen purchased or sold in investors' accounts at E*trade shows none of the investors profited from Kunen's trading.

20.     For example, on January 30, 2007, Kunen effected his index option strategy in an E*Trade investor's account. Prior to that date, the investor funded the account with $200,000. Kunen purchased 200 S&P 500 Index call option contracts in the account with a strike price of 1445 and expiring on February 17, 2007. Each contract cost $3.70, for a total of $74,155. That same day, the account sold short 200 S&P 500 Index call option contracts with a strike price of 1435 and an expiration date of February 17, 2007.

21.     Because Kunen sold option contracts, the account did not own an equivalent amount of the same option contract needed to be purchased to close the position. Once the position was closed the account would have a realized profit or loss.

22.     Kunen sold these call options for $7.30, generating proceeds of $145,845. These two transactions resulted in an immediate, unrealized credit of $71,690 in the account.

23.     On or about January 30, 2007, Kunen told the investor the options trading program had generated approximately $72,000 in profits. Kunen directed the investor to wire approximately $32,000 to his mother, which, according to Kunen, represented the profit exceeding 20% of the investor's original investment. The investor complied with Kunen's request and wired the funds.

24.     The option trades Kunen effected in this investor's account in the aggregate was equivalent to a bet on the downward direction of the S&P 500 Index over the following two weeks. Between January 30, 2007 and February 16, 2007, the S&P 500 Index rose

approximately 20 points. The investor's E*Trade account statements reflect the losses incurred as a result of the S&P 500 Index's advance.

25. On February 16, 2007, Kunen sold the 200 S&P 500 Index 1445 call option contracts for $7.26 each, or total proceeds of $145,180. Thus, the 1445 call options netted $71,025 (the $145,180 sales proceeds minus the initial cost of $74,155). However, those $71,025 in gains were more than offset by the $199,375 the S&P Index 1435 call options lost (the 1435 call options Kunen purchased to cover the open position cost $17.26 each, or a total of $345,220, and only generated $145,845 when sold). Thus, the net loss in the account from all the trades was $128,350 in a little more than two weeks, far different than the $72,000 gain Kunen told the investor the trades had generated when executed.

26. Virtually all the investors similarly lost all or nearly all of their entire principal.

27. An investigation by E*Trade into Kunen's account there revealed Kunen used some of the investor money he received from January through April 2007 for what appear to be personal expenses. For example, using a debit card associated with his E*Trade account, Kunen made purchases totaling more than $150,000 at three jewelry stores. Kunen also wrote checks to a BMW car dealership for approximately $30,000, and a department store for approximately $10,000. He also wrote $23,500 in checks to individuals with the same last name as him, including his mother. Additionally, Kunen paid at least $50,000 to individuals who referred investors to him.

28. Approximately $751,702 in investor funds remain in an E*Trade account under Kunen's name.

29. Kunen died on July 11, 2007, in St. Maarten. On August 7, 2007, Morgan, as Personal Representative of the Kunen Estate, wrote to E*Trade inquiring about the funds remaining in Kunen's E*Trade account.

## II. Material Misrepresentations and Omissions in Connection with the Offer and Sale of the Options Trading Program

30. In the process of soliciting investments, Kunen distributed written materials containing false statements and omissions. In addition, Kunen orally made these same false statements and omissions of material fact. The material misrepresentations and omissions include:

### A. Kunen's Background

31. Kunen touted himself as a successful trader. In addition, he told investors he previously owned a brokerage firm.

32. These statements were false and misleading because Kunen never owned a brokerage firm, failed to tell investors he was a convicted felon, and failed to tell investors he was incarcerated for some of the time he claimed he was successfully running the options trading program for other investors.

### B. Investments Were Not Risk-Free

33. Kunen's written materials touted the options trading program as being risk-free. Kunen also told investors their investment was risk-free and that he personally would guarantee their principal.

34. These statements were false and misleading because Kunen failed to tell investors the investments he made, which included speculative index options trading, lost hundreds of thousands of dollars and did not provide safe or guaranteed returns. Realized investor losses from Kunen's options trading program were more than $1 million.

35. Using this options trading program, Kunen received approximately $1 million in fraudulently obtained compensation from investors.

### C. The Options Trading Program Could Not Guarantee A 10% to 20% Return

36. Written materials Kunen distributed to potential investors stated the trading program guaranteed an average monthly return of 10% to 20% of the principal. Also, Kunen made this statement orally to potential investors.

37. These statements were false and misleading. Among other things, investing in index options by its nature involves undertaking risk. Thus Kunen could not guarantee a 10% to 20% return on investments on a monthly basis.

## COUNT I

### FRAUD IN VIOLATION OF
### SECTION 17(a)(1) OF THE SECURITIES ACT

38. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39. From at least January 2007 through July 2007, Kunen directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

40. By reason of the foregoing, Kunen, directly and indirectly, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### FRAUD IN VIOLATION OF
### SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT

41. The Commission repeats and realleges Paragraphs 1 through 37 of its Complaint as if fully set forth herein.

42. From at least January 2007 through July 2007, Kunen directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and

9

by the use of the mails, in the offer or sale of securities, has: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon purchasers of such securities.

43.     By reason of the foregoing, Kunen directly and indirectly, violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## COUNT III

## FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

44.     The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint as if fully set forth herein.

45.     From at least January 2007 through July 2007, Kunen, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

46.     By reason of the foregoing, Kunen directly or indirectly, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I. Declaratory Relief

Declare, determine and find that Kunen committed the violations of the federal securities laws alleged in this Complaint.

### II. Disgorgement

Issue an Order requiring the Kunen Estate to disgorge all ill-gotten profits or proceeds it received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

### III. Asset Freeze and Accounting

Issue an Order freezing the assets of the Kunen Estate, until further Order of the Court, and requiring from Defendant Morgan a document sworn to before a notary public setting forth all assets (whether real or personal) and accounts (including, but not limited to, bank accounts, savings accounts, securities or brokerage accounts, and deposits of any kind) in which the Kunen Estate (whether solely or jointly), directly or indirectly (including through a corporation, trust or partnership), either has an interest or over which it has the power or right to exercise control.

### IV. Appointment of Receiver

Issue an Order appointing a Receiver over the Kunen Estate, to marshal and safeguard all of said assets, to perform any other duties the Court deems appropriate, and to prepare a report to the Court and the Commission detailing the activities of the Kunen Estate, and the whereabouts of investor funds.

### V. Records Preservation

Issue an Order requiring Defendant Morgan to preserve any records related to the subject matter of this lawsuit that are in the Kunen Estate's custody, possession or control.

## VI. Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII. Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

August 23, 2007        By: _____
                           Roger Cruz
                           Senior Trial Counsel
                           Florida Bar No. 157971
                           Direct Dial: (305) 982-6379

                           Salvatore Massa
                           Senior Counsel
                           Wisconsin Bar No. 1029907
                           Direct Dial: (305) 416-6270

                           Attorneys for Plaintiff
                           **SECURITIES AND EXCHANGE COMMISSION**
                           801 Brickell Avenue, Suite 1800
                           Miami, Florida 33131
                           Telephone:  (305) 982-6300
                           Facsimile:  (305) 536-4154

**%JS 44** (Rev. 11/05)

# CIVIL COVER SHEET

07-22204

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
Charles O. Morgan, Jr. as Personal Rep. of The Estate of Frederick J. Kunen

CIV - GOLD

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Roger Cruz, Esq. (305) 982-6379
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800, Miami, FL 33131

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**MAGISTRATE JUDGE TURNOFF**

Attorneys (If Known)
Charles O. Morgan, Jr., Ph: 305-624-0011; 1300 NW 167th Street, Suite 3, Miami, FL 33169

(d) Check County Where Action Arose: ✓ MIAMI-DADE □ MONROE □ BROWARD □ PALM BEACH □ MARTIN □ ST. LUCIE □ INDIAN RIVER □ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

✓ 1 U.S. Government Plaintiff
□ 2 U.S. Government Defendant
□ 3 Federal Question (U.S. Government Not a Party)
□ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business In This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business In Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

Miami 07CV 22204 Gold/Turnoff

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| □ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | □ 610 Agriculture | □ 422 Appeal 28 USC 158 | □ 400 State Reapportionment |
| □ 120 Marine | □ 310 Airplane / □ 362 Personal Injury - Med. Malpractice | □ 620 Other Food & Drug | □ 423 Withdrawal 28 USC 157 | □ 410 Antitrust |
| □ 130 Miller Act | □ 315 Airplane Product Liability | □ 625 Drug Related Seizure of Property 21 USC 881 |  | □ 430 Banks and Banking |
| □ 140 Negotiable Instrument |  / □ 365 Personal Injury - Product Liability | □ 630 Liquor Laws | **PROPERTY RIGHTS** | □ 450 Commerce |
| □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 320 Assault, Libel & Slander / □ 368 Asbestos Personal Injury Product Liability | □ 640 R.R. & Truck | □ 820 Copyrights | □ 460 Deportation |
| □ 151 Medicare Act | □ 330 Federal Employers' Liability | □ 650 Airline Regs. | □ 830 Patent | □ 470 Racketeer Influenced and Corrupt Organizations |
| □ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | □ 340 Marine | □ 660 Occupational Safety/Health | □ 840 Trademark | □ 480 Consumer Credit |
|  |  **PERSONAL PROPERTY** | □ 690 Other |  | □ 490 Cable/Sat TV |
| □ 153 Recovery of Overpayment of Veteran's Benefits | □ 345 Marine Product Liability / □ 370 Other Fraud |  |  | □ 810 Selective Service |
|  |  | **LABOR** | **SOCIAL SECURITY** | ■ 850 Securities/Commodities/Exchange |
| □ 160 Stockholders' Suits | □ 350 Motor Vehicle / □ 371 Truth in Lending | □ 710 Fair Labor Standards Act | □ 861 HIA (1395ff) |  |
| □ 190 Other Contract | □ 355 Motor Vehicle Product Liability / □ 380 Other Personal Property Damage | □ 720 Labor/Mgmt. Relations | □ 862 Black Lung (923) | □ 875 Customer Challenge 12 USC 3410 |
| □ 195 Contract Product Liability | □ 360 Other Personal Injury / □ 385 Property Damage Product Liability | □ 730 Labor/Mgmt.Reporting & Disclosure Act | □ 863 DIWC/DIWW (405(g)) | □ 890 Other Statutory Actions |
| □ 196 Franchise |  |  | □ 864 SSID Title XVI | □ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | □ 740 Railway Labor Act | □ 865 RSI (405(g)) | □ 892 Economic Stabilization Act |
| □ 210 Land Condemnation | □ 441 Voting / □ 510 Motions to Vacate Sentence | □ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | □ 893 Environmental Matters |
| □ 220 Foreclosure | □ 442 Employment | □ 791 Empl. Ret. Inc. Security Act | □ 870 Taxes (U.S. Plaintiff or Defendant) | □ 894 Energy Allocation Act |
| □ 230 Rent Lease & Ejectment | □ 443 Housing/Accommodations / **Habeas Corpus:** |  | □ 871 IRS—Third Party 26 USC 7609 | □ 895 Freedom of Information Act |
| □ 240 Torts to Land |  / □ 530 General |  |  |  |
| □ 245 Tort Product Liability | □ 444 Welfare / □ 535 Death Penalty |  |  | □ 900 Appeal of Fee Determination Under Equal Access to Justice |
| □ 290 All Other Real Property | □ 445 Amer. w/Disabilities - Employment / □ 540 Mandamus & Other |  |  |  |
|  |  / □ 550 Civil Rights |  |  | □ 950 Constitutionality of State Statutes |
|  | □ 446 Amer. w/Disabilities - Other / □ 555 Prison Condition |  |  |  |
|  | □ 440 Other Civil Rights |  |  |  |

AUG 23 2007
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

## V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
□ 2 Removed from State Court
□ 3 Re-filed- (see VI below)
□ 4 Reinstated or Reopened
□ 5 Transferred from another district (specify)
□ 6 Multidistrict Litigation
□ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case □ YES ✓ NO   b) Related Cases □ YES ✓ NO
JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. § 77q(a)(1); 15 U.S.C. § 78j(b); 17 C.F.R. § 240. 10b-5; 15 U.S.C. §§ 77(q)(a)(2) and 77 (q)(a)(3). Violations of the federal securities laws.
LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
□ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Asset Freeze, Disgorgement
CHECK YES only if demanded in complaint:
JURY DEMAND: □ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD   Roger Cruz
DATE 08/23/07

**FOR OFFICE USE ONLY**
AMOUNT _____   RECEIPT # _____   IFP _____